# EXHIBIT A



# Employment Agreement

This **Employment Agreement** (the "Agreement") is agreed and entered into between Precision Global Consulting, Inc. ("Company") of 135 West 29th Street, Suite 1102, New York, NY 10001 and __Caroline Catz_____ ("Employee") and has an effective date of ____4/16/2018_____.

1. **Scope.**  Employee agrees by entering into this Agreement to provide Company's Client, or their End Client, (together "Client") with professional services for individual Client Assignments ("Assignment") as an employee of Company.  For each role, Employee will receive a detailed Schedule ("Schedule") that designates hourly rate, dates of role, location, additional benefits provided by Client and other details specific to the placement.  The Schedule will exist in conjunction with this Agreement and should any terms contradict, the Schedule will supersede.

2. **Time Keeping and Compensation**
    a. Employee will keep and submit complete and accurate records of his/her progress on work assignments.  Employee is to submit his/her work hours, along with Client approval of such hours, via e-mail to workforcesolutions@pgcgroup.com.  When required, Employee will submit hours via Client required methods as detailed in the Schedule.  Employee will be paid at the rate and frequency listed in the Schedule.
    b. The Employee must receive written approval from the Client Manager in order to perform work of overtime hours.  Absent such approval, non-exempt employees may not work any overtime hours.  An employee who inaccurately reports any hours worked will be subject to disciplinary action, including but not limited to termination. Please note that if you are a patron of a community bank or a credit union, you may experience a delay in receiving your direct deposit payment due to the internal processes of these institutions. Please contact us if you have not received your direct deposit 24 hours after it was scheduled to arrive.
    c. The employee's regular pay will be deposited into the Employee's bank account via direct deposit on, at least, a monthly basis or as required by state wage law requirements.
    d. If, in accordance with the Schedule or at Client's request, Employee is entitled to additional compensation in the form of a bonus (discretionary or non-discretionary), commission, or other pay in addition to the pay received for hours worked or regular salary, Employee understands that payment for additional compensation will only be disbursed to the Employee upon payment in full by Client to Company of additional funds.
    e. Employment with Company becomes effective on the first day in which services are actually provided by Employee.  If Employee fails to ever provide or begin services, they will not be deemed as an employee of Company.

3. **Business Expenses.**  The Company will reimburse ordinary and necessary business expenses that have been approved and paid by the Client within 3 business days of receipt of the funds from the Client; or in accordance with Client's expense policy.  To receive reimbursement, all qualified expenses must



be submitted with receipts no later than thirty (30) days after the expenses are incurred. The Company has the right to deny the expenses regardless of Client approval if expenses are not allowable by IRS guidelines or if the expenses are not submitted in the 30-day window after they are incurred. If the Company does not approve the submitted expenses but they are paid by the Client, the funds will be paid to Employee as taxable income and will be taxed accordingly
  a. If Client requires the Employee to travel, such travel must be approved in advance by a Client manager. Any travel related expenses must be clearly defined as such and submitted to the Company along with documents of proof of travel. If Client provides reimbursement for meals while traveling, the funds will be provided to the Employee in the form of Per Diem and Employee will receive a per diem rate calculated as less than or equal to the government determined amount based on the location of the Employee.
  b. Should the Employee have other ordinary and necessary business expenses that are not reimbursed by the Client, they may be used to reduce the Employee's taxable income provided the Employee complies with any policy provided by the Company regarding acceptable expenses. The Company reserves the right to deny any expenses for any reason.

4. Benefits
   a. **Medical.** Company offers a Group Medical Plan to all Full Time Employees that is compliant with PPACA. A Full Time Employee is defined as those providing at least 30 hours per week of service on average. In the event that Employee does not average at least 30 hours per week of work or falls out of Full Time status, Employee may become ineligible and coverage will be withdrawn. Employees may be responsible for a portion of plan costs depending on the plan chosen by Employee and Company's contribution amount as agreed between Company and Client. Employee contribution costs will be withheld from Employee's first paycheck of every month. If the Employee's portion of the contribution cannot be covered with the withheld amount, the Employee is responsible for remitting payment to Company within three business days of the total contribution due. If payment is not received on the third business day, Employee's benefits coverages will be retroactively terminated to the start of the non-payment month. Employee will be ineligible to re-enroll until the next open enrollment.
   b. **401(k).** Company offers eligible Employees the opportunity to enroll in an ERISA compliant employee retirement savings plan. Employee will be provided with additional eligibility information as part of the onboarding process. Should you opt to contribute to a 401(k), you agree that a percentage of your pay will be deducted from each paycheck to fund this contribution. There is no employer match or contribution, unless you have been specifically advised otherwise. If there is an employer match or contribution, this contribution may change or be halted at any time.

5. **Holiday/Personal Leave.**



    a. **Vacation/Personal Leave.** The Employee will not receive paid holiday/vacation/personal leave, unless agreed by the Client and provided for in the Schedule. PGC will remain complaint with local, state, and federal laws regarding personal unpaid leave.

    b. **Paid Sick Leave.** If Employee is performing work in a city or state that requires Employer to provide mandatory paid sick leave, Employee will be entitled to accrue and be paid in accordance with the law. If Employee is offered any benefits that include paid time off equal to or in excess of the paid sick leave regulation, it is to be understood that this paid time off is to be inclusive of any federal, state, or local mandated paid sick leave.

    c. **Public Holidays.** Unless otherwise agreed to by the Client, the Employee will not receive pay for any public holidays.

    d. **Client.** For additional Client entitlements see respective Schedule.

6. **Adherence to Client and Company Policies**

    a. **Company/Client Provided Equipment.** Company or Client may provide on-site workspace and or materials such as instructional documents, manuals, computers, personal communication devices, software programs, ID cards, tools, etc. It is the responsibility of the Employee to treat Company/Client supplied materials with care. Any materials or equipment ("Equipment") loaned to Employee by Company, Client are to be returned to respective party no later than one week after Assignment completion or termination, unless Client requires earlier. Employee will be responsible for the estimated value of any unreturned equipment. Where allowable by law, Company will deduct from any payments owed to Employee the value of any Company, Client or End Client property that remains unreturned at termination of employment. This clause will act as sufficient written authorization to make such deductions.

    b. **Employee Provided Equipment.** In the event that Client requires Employee to provide his/her own equipment, Employee is responsible for all costs associated with obtaining such equipment and will not hold Company liable for any costs or damages incurred as a result of such a requirement.

    c. **Drug Testing and Background Screening.** If requested, Employee shall submit to any Company or Client required drug test, fingerprinting, and/or background checks so long as such a test or check is compliant with local, state, and federal laws. Employee authorizes the release of all results to Company and Client. If Employee fails, for any reason to submit to a drug test, fingerprinting or background check, or Employee fails their drug test or background check identifies negative results, Company may terminate employment effective immediately and relay such information to Client.

    d. **On-Site Work Rules.** While at Client or Company facilities, Employee will observe all applicable Company and Client work rules, policies and procedures including safety and security, sexual harassment, non-discrimination, alcohol and drug use. In addition to observing such policies and procedures, Employee will report to Company and Client any



   violations of Company or Client's policies or procedures and cooperate with any investigation of the alleged violations.
   e. **Client.** For additional Client requirements see respective Schedule.

7. **Term and Termination.**
   a. **Company-Initiated Termination.** This is an "At Will" employment agreement and the Employee understands the Company may terminate his/her employment at any time or for any reason, provided the termination is not in violation of local, state, or federal law. Nothing in this Agreement or any actions by the Company shall be construed to alter the "At Will" relationship.
      i. If Employee does not perform work for any Client for a period of six (6) months from the last day of most recent Assignment, Employee will be treated as terminated unless otherwise notified, but will not be prevented from being rehired by Company for future Assignments. In such an event, Employee will not receive notice of termination.
   b. **Employee-initiated Termination.** The Employee shall have the ability to terminate this Agreement and his/her employment with the Company at any time, but is requested to provide two weeks' prior notice, or the amount of notice required by the Client as detailed in the attached Schedule, whichever is greater.
   c. **Notice of Assignment Completion/Client Termination**. It is the responsibility of the Employee to notify the Company of Assignment completion, Client termination of Employee, or Client providing notice of termination to Employee. If Employee and/or Client fails to notify Company of such, resulting in an overpayment to the Employee, or if a clerical error by Company results in an overpayment, Company may recoup the overpayment by any means allowable by local, state, or federal law.
      i. Where allowed and applicable, Company may deduct any amounts due for overpayment from Employee's future paycheck, including his/her final paycheck.
      ii. If deducting overpayment from paycheck is not allowable by law or if Employee is not expected to receive further pay, Employee is required to refund Company any amounts paid as an overpayment within 10 days' notice from Company. Any wire fees associated with this refund will be the responsibility of the Employee.

8. **Employment Eligibility and I-9 Completion.** United States Citizenship and Immigration Services (USCIS) requires that all employees to be employed in the United States must complete the *I-9 Employment Eligibility Form* establishing identity and employment eligibility. If completing Section 2 of the I-9 form through an Authorized Agent of the Company, employee must follow the instructions provided by the *Remote Hire I-9 Completion Instructions and Authorized Agent Letter*. It is mandatory that the employee provide the fully completed form to PGC **within 3 business days** of employee's first



day of employment.  Failure to return the completed I-9 Form within this time period can result in termination of the employee.

**Form W-4.**  Employee will receive no payment from Company until Employee provides Company with a properly completed W-4 Form.

9. **Confidentiality.**
   a. **Company.** Employees are expected to maintain the highest standards of confidentiality in regard to Company's and Client's Confidential Information.  "Confidential Information" is defined as business information, new business strategies and efforts, financial information to which the Employee may become privy, and all matters related to personnel, computer programs, research, internal operations, trade secrets, and policies.  Employees who breach the confidence of the Company and/or the Client are subject to immediate termination. Employee should not, without prior written consent by the Company and/or the Client, disseminate, discuss, or otherwise provide to third parties the Company's or the Client's confidential information and all other propriety information unless required by law or legal proceeding.
   b. **Protection of Employee Personal Data.**  The Company will use its best efforts to protect Employee's personal information and data.  Employee agrees to give the Company the ability to share Employee Personal Data, including but not limited to social security number, address, and date of birth, with third party providers when required for the administration of payroll and employee benefits.   Additionally, Employee agrees to allow Company to provide such Employee Personal Data with Client when necessary.  The Company agrees to obtain, monitor and process personal information regarding its employees to meet its legitimate needs relating to third party payroll and benefits providers.
   c. **Client.** For additional Client requirements see respective Schedule.
   d. **Law Enforcement.** Employee understands that Company may at its discretion report any criminal wrongdoing by the Employee that is in violation of local, state, or federal law to the appropriate authorities up to and including the FBI, DOJ, and DHS. Company will comply with all legal requests from authorities to produce information that may include Employee Personal Data.

10. **Intellectual Property.**
    a. **Company.**  Employee agrees that Company will be the sole and exclusive owner of all Employee "Work Product" hereby defined as rights, title, and interest in all ideas, concepts, inventions, expression, information, materials, and works of authorship, regardless of location, possession, form or physical embodiment, including without limitation, plans, programs, programming code, systems, work notes, drafts, specifications, analyses, inventions, developments, improvements, business processes, business practices, employee



lists, contact lists, website design data, surveys, print copy, artwork, photo databases and reports, prepared in connection with this Agreement and the performance of the services, whether conceived or made by Employee alone or with others.  Employee irrevocably assigns to Company, its successors and assigns, all rights, title and interest that Employee has in such work product.  Such an assignment is required by Company in order to transfer such rights to Client or third party for whom work product was created while providing professional services.  Once transferred, Company will hold no rights, title or interests in such Intellectual property as all rights, title and interest will vest in Client or third party.
  b. **Employee.**  Company has no right to inventions or other material for which no equipment, supplies, facilities or Confidential Information and Material of Company or its Clients are used and which are developed entirely on Employees' own time and (1) do not relate directly to the business of Company or Client or (2) do not result from any work performed by Employee hereunder.
  c. **Client.** For additional Client requirements see respective Schedule.

11. **Non-Compete.**
  a. **Company.** The Company has expended significant time and resources developing its business model, client base, and infrastructure and the formation of an employer of record or consultant management firm by the Employee or any of his assigns during or for twelve (12) months following the termination of employment would cause irreparable harm to the Company and its business interests. To avoid such harm, the Employee is prohibited from competitive activity specific to that of Company's business model (Employer of Record, Professional Employer Organization, Staffing Service, Payroll service), during or within twelve (12) months following the last day of employment without the prior written consent from the Company.  Nothing in this section is meant to restrict Employee from engaging with or providing services to another client, employer, staffing company, employment agency, etc. upon the termination of this Agreement, unless otherwise detailed in Schedule. This section only protects the Company and the resources it has expended to create an enterprise product for its Clients.
  b. **Applicability.** This non-compete provision will be enforced to the extent permitted by state and local law. This non-compete provision is not applicable to employees working in California, North Dakota, and Oklahoma.
  c. **Client.** For additional Client requirements see respective Schedule.

12. **Indemnification**.  Employee shall indemnify and keep indemnified, defend and hold harmless, Company, its affiliates and each of their respective partners, officers, directors, other employees and agents from and against any and all damages, claims, liabilities, judgments, actions, lawsuits, costs (including reasonable attorneys' fees and costs) and expenses arising out of Employee's gross negligence or willful misconduct, or any breach or inaccuracy of any covenant, representation or



warranty by Employee of this Agreement. **LIMITATION OF LIABILITY.** NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY LOST PROFITS OR INCIDENTAL, CONSEQUENTIAL, PUNITIVE, SPECIAL OR OTHER INDIRECT DAMAGES OF ANY KIND FOR ANY REASON WHATSOEVER INCLUDING BUT NOT LIMITED TO, DAMAGES BASED UPON NEGLIGENCE, BREACH OF WARRANTY, STRICT LIABILITY, OR ANY OTHER THEORY EVEN IF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. EACH PARTY AGREES THAT THE OTHER PARTY'S LIABILITY HEREUNDER FOR DAMAGES, REGARDLESS OF THE FORM OF ACTION, SHALL NOT EXCEED THE TOTAL AMOUNT, ACTUALLY PAID TO CONTRACTOR FOR SERVICES UNDER THE APPLICABLE WORK ORDER.  THE PARTIES AGREE THAT THE AMOUNTS STATED HEREIN ARE FAIR UNDER THE CIRCUMSTANCES AND THAT THE PROCESS REFLECT THE LIMITATION OF LIABILITY.

13. **Miscellaneous.**
    a. **Amendments.**  Any Amendments to the Agreement must be in writing and signed by both parties.
    b. **Warranties.**  Employee warrants and represents that Employee has the ability, knowledge and expertise to adequately perform the services outlined in the Schedule and will perform the services in a professional manner in accordance with the highest industry standards and requirements of the Schedule.
    c. **Validity.** Any invalidity, unenforceability, or voidability of any provision or provisions of this Agreement will not affect the validity or enforceability of any other provision of this Agreement, which will remain in full force and effect.
    d. **Survival.**  The provisions of this Agreement, by their sense and context that are intended to survive performance by either or both parties shall also survive the completion, expiration, termination, or cancellation of this Agreement or any Assignment.
    e. **Cooperation.**  Employee agrees to fully cooperate with Company in connection with any legal or business matter relating to the services provided by Employee under this Agreement
    f. **Assignment.**  Employee may not assign, delegate, subcontract or transfer this Agreement or any of Employee's performance obligations in any manner without prior written approval of Company.

14. **Arbitration/Mediation.**
    a. Any controversy, dispute, or claim arising out of or relating to this Agreement, the employment relationship, or any breach thereof shall first be settled confidentially through good faith negotiation between the disputing parties. If the dispute cannot be settled through good faith negotiation, the parties agree to attempt in good faith to settle the dispute by binding arbitration in accordance with FAA standards as administered by JAMS in the State of New York and County of New York. In the event of any disagreements about the arbitrator, Company will have the final decision on the arbitrator assigned to the dispute. It is understood



**PRECISION GLOBAL CONSULTING**

by Company and Employee that the cost of the arbitration shall be split equally amongst both parties in the interest of equity and fairness.

b. **CLASS ACTION WAIVER:** ARBITRATION MUST BE ON AN INDIVIDUAL BASIS. THIS MEANS YOU NOT MAY JOIN OR CONSOLIDATE CLAIMS IN ARBITRATION BY, WITH, OR AGAINST OTHER EMPLOYEES OR COMPANY, OR LITIGATE IN COURT OR ARBITRATE ANY CLAIMS AS A REPRESENTATIVE OR MEMBER OF A CLASS OR IN A PRIVATE ATTORNEY GENERAL CAPACITY.

c. This arbitration provision shall survive: the end of your employment; any legal proceedings to collect money you owe; any bankruptcy by you; and any sale by Company of part or all of Company.

15. **Governing Law.** The laws of the State of New York shall govern the entirety of this Agreement and any claims related to terms or conditions of employment. If an employee primarily resides and works in California, the laws of the State of California will govern.

I have read the above terms to this Agreement and confirm that I had the opportunity to inquire to the Company or another qualified person to discuss any aspects that I did not understand. I understand all terms contained within the Agreement, and hereby agree to all of the terms contained herein.

_Caroline Catz_
Employee Printed Name

_[signature]_                                    4/18/18
Employee Signature                               Date

_Niekeda Bourgeois_                              4/18/18
Company                                          Date