UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CAROLINE CATZ,

                            Plaintiff,

          –against–

PRECISION GLOBAL CONSULTING, SELBY
JENNINGS a/k/a PHAIDON INTERNATIONAL,
and D2 LEGAL TECHNOLOGY,

                            Defendants.

**OPINION AND ORDER**

19 Civ. 7499 (ER)

RAMOS, D.J.:

        Caroline Catz brings this action *pro se* against Precision Global Consulting ("PGC"), D2

Legal Technology Ltd. ("D2"), and Phaidon International ("Phaidon"), alleging violations of the

Equal Pay Act ("EPA"), the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights

Act of 1964 ("Title VII"), and 42 U.S.C. § 1981 against each defendant.  Before the Court are

motions to compel arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–3,

submitted by PGC, D2, and Phaidon respectively.  For the reasons set forth below, the Court

grants the defendants' motions to compel arbitration and will stay proceedings pending the

outcome of arbitration.  However, the Court denies Phaidon's and D2's motions to the extent that

they seek partial dismissal of the case.

I.   **BACKGROUND**

     a.  **Factual Background**

        In 2018, D2, a legal consulting firm based in London, England, sought the assistance of

Phaidon, a global recruiting and staffing agency, to identify an experienced financial-transactions

lawyer for its temporary position of Lead International Swaps and Derivatives Association

("ISDA") Negotiator.  Doc. 28 at 5; Doc. 34 at 6.  D2 had been enlisted by an investment bank to

conduct a review for compliance with banking regulations, and the candidate hired for this position would work out of the investment bank's North Carolina offices.  Doc. 35, ¶¶ 1, 2, 4.  On March 20, 2018, Phaidon began recruiting Caroline Catz for the position with D2.  Doc. 2 at 10–11; Doc. 28 at 6.  Catz is a self-described "accomplished, intelligent and articulate 46-year-old professional American woman of Haitian descent."  Doc. 2 at 10.  Among other undergraduate and advanced degrees, she holds a Juris Doctor from Columbia Law School and is a member of the New York State Bar.  *Id.*  According to Catz, Phaidon initially told her that the position would be based in New York.[1]  *Id.* at 11.

On March 23, 2018, Catz interviewed with Paul Chymiy, D2's Head of U.S. Operations, at Phaidon's New York office, after which she was offered the position of Lead ISDA Negotiator.  Doc. 2 at 11; Doc. 35, ¶ 5.  During this interview, Chymiy told Catz that the position was based in Raleigh, North Carolina—not New York—and that it would require her to relocate to Raleigh for the duration of the project, which was expected to take about one year.  Doc. 2 at 11.  On March 30, 2018, Catz received a "Confirmation of Contract" from Phaidon, which noted that her contract would be assigned to D2, and which provided basic compensation information.  Doc. 2 at 12; Doc. 41-5.  This one-page document explained that "these details are for [Catz's] information only" and that "a formal contract of employment will be sent to [Catz] by [D2]."  Doc. 41-5.  Before Catz signed the Confirmation of Contract, she contends that the defendants made her a litany of promises about her employment.  Doc. 2 at 12–13.  According to Catz, they promised that the role would provide the senior managerial opportunity she was seeking.  *Id.*  They promised that she would receive a per diem of ninety dollars per day, seven days a week, in

---

[1] Phaidon's initial outreach to Catz through email and LinkedIn explained that the position would be based in "both New York and North Carolina."  Doc. 41-16.

consideration of the substantial costs of relocating from New York to Raleigh.[2]  *Id.* at 13.  They promised that she would receive a cash advance to cover her travel expenses and initial hotel expenses in Raleigh.  *Id.*  And they promised that she would have at least four weeks to relocate to Raleigh, so that she could wrap up her affairs in New York.  *Id.*  Catz signed and returned the Confirmation of Contract on April 2, 2018.  *Id.*; Doc. 41-5.  Subsequently, Catz signed an "Agreement in relation to Provision of Services" with D2.[3]  Doc. 41-7; Doc. 41-8.  This agreement, which describes the terms of Catz's independent consultancy for D2, defined D2 as "the Client," Catz as "the Independent Consultant," and PGC as "the Consultant Company." Doc. 41-8.

On April 5, 2018, PGC, "a workforce management platform that employs workers on its clients' behalf and handles the administrative responsibility for those workers," emailed Catz, explaining that it would be her "employer of record."  Doc. 28 at 6; Doc. 29, ¶ 7; Doc. 31 at 7, 9; Doc. 32-4.  PGC's email included onboarding instructions to access the employment agreement ("Employment Agreement").  Doc. 29-1; Doc. 32-4.  The Employment Agreement, which is on PGC letterhead, states that it is "agreed and entered into between Precision Global Consulting, Inc. ("Company") . . . and Caroline Catz ("Employee")."  Doc. 29-1 at 2.  It states that Catz will provide PGC's "Client" or its "End Client" with professional services, as defined by an accompanying W2 Schedule that "will exist in conjunction with" and, in the instance of contradictory terms, "will supersede" the Employment Agreement.  *Id.*  Although the

---

[2] The Court notes that the Confirmation of Contract that Catz would later sign states that Catz would receive "$75.00/day for personal expenses."  Doc. 41-5.

[3] An unexecuted version of this document is located at Exhibit D to Doc. 41, Doc. 41-8.  Exhibit D separately contains a single page, which appears to be the signature page of this document.  Doc. 41-7.  It is signed by Catz, though it is not signed by D2—the agreement's only other signatory.  This signature page is dated March 20, 2018, which precedes the chronology indicated by the parties.  However, Catz contends that she actually signed this agreement "[o]n or about" April 18, 2018.  Doc. 44 at 12.

Employment Agreement does not mention Phaidon or D2 by name, the accompanying W2 Schedule, also on PGC letterhead, explicitly defines Phaidon as PGC's "Client" and D2 as its "End Client."  Doc. 29-2.  As PGC's end client, D2 would be the main entity receiving Catz's professional services at the investment bank's North Carolina offices.  *Id.*; Doc. 35, ¶ 4.  The Employment Agreement and the W2 Schedule provide that Catz's employment with PGC is at-will and that PGC may terminate her employment at any time, for any reason and without notice.  Doc. 29-1 at 5; Doc. 29-2 at 3.  The Employment Agreement further provides an "Arbitration/Mediation" provision, which states, in relevant part, that:

> [a]ny controversy, dispute, or claim arising out of or relating to this Agreement, the employment relationship, or any breach thereof shall first be settled confidentially through good faith negotiation between the disputing parties.  If the dispute cannot be settled through good faith negotiation, the parties agree to attempt in good faith to settle the dispute by binding arbitration in accordance with FAA standards as administered by JAMS in the State of New York and County of New York.

Doc. 29-1 at 8.

Before Catz signed the Employment Agreement, she alleges that, despite the promise that she would have at least four weeks to relocate to Raleigh, the defendants told her she would have to report to Raleigh by April 11, 2018—three weeks earlier than Catz had expected.  Doc. 2 at 15.  Catz reported to Raleigh by that date, still before signing the Employment Agreement, which she had received on April 5, 2018.  *Id.*; Doc. 32-4.  On April 18, 2018, Catz returned signed copies of the Employment Agreement and the W2 Schedule to PGC.[4]  Doc. 29 at ¶ 10; Doc. 29-1; Doc. 29-2.  Catz and PGC were signatories to these documents; Phaidon and D2 were not.

After Catz began working, she alleges that the defendants reneged on the other promises they had made to her before she signed the Employment Agreement.  Doc. 2 at 15–17.

---

[4] Catz contends that these documents were actually signed on April 23, 2018, but that she had pre-dated the documents before signing them to read April 18, 2018.  Doc. 44 at 17 n.4.

Specifically, she alleges that they failed to provide her with a cash advance to cover relocation expenses. *Id.* at 15. She alleges that the defendants reduced her per diem to five days per week, instead of the promised seven days per week, and that, in any event, they failed to pay her the per diem altogether. *Id.* at 15–17. She alleges that the defendants failed to reimburse her for work-related expenses and that they failed to give her access to the promised databases, training, and support to acquaint her with the job. *Id.* at 17. She alleges that they relegated her to the role of document reviewer, which did not provide the senior managerial opportunity she was promised. *Id.*

Catz further alleges that the defendants subjected her to unlawful discriminatory conduct because of her gender and race. *Id.* at 18. Specifically, Catz alleges that white male employees who performed "comparable or less work" received more favorable compensation and benefits and more frequent training and professional education opportunities than she did. *Id.* Catz maintains that "[f]emale and African American reviewers were treated—and felt like—second-class citizens, even though most, if not all of them, were more qualified, experienced and proficient at their work" than a particular white male colleague who allegedly received preferential treatment. *Id.* at 18–19. Catz alleges that she was relegated to the role of document reviewer in retaliation for speaking out about this discriminatory conduct. *Id.* at 21–22.

Separately, Catz alleges that the defendants failed to maintain accurate records and pay overtime wages to deserving employees. *Id.* at 22. Catz contends that the defendants knew, or should have known, that she frequently worked more than forty hours per week, but that they failed to compensate her for this time. *Id.* Further, Catz alleges that the defendants implemented policies and procedures designed to prevent employees from accurately recording their hours and receiving overtime wages. *Id.* Finally, Catz alleges that, on June 15, 2018, after approximately

two months of employment, Phaidon sent her a text message informing her that D2 had terminated her contract without explanation.[5]  *Id.* at 21–22.

### b. Procedural History

On December 11, 2018, Catz filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against PGC, D2, and Phaidon.  Doc. 28 at 6–7.  On March 6, 2019, the EEOC dismissed Catz's charge and issued a Notice of Right to Sue, giving her ninety days from receipt of the Notice to file her complaint against the defendants.  Doc. 32-6. On May 28, 2019, before the ninety-day period expired, Catz, PGC, D2, and Phaidon entered into a Tolling Agreement, agreeing to try to resolve the dispute through joint mediation on June 14, 2019.  Doc. 32-7.  The parties also agreed to toll the ninety-day filing deadline until July 31, 2019.  *Id.*  When joint mediation was unsuccessful, the parties agreed to further toll the deadline until August 8, 2019.  Doc. 31 at 19–20; Doc. 32-7.

Catz's complaint was received by this District's Pro Se Office on the August 8, 2019 deadline and was docketed on August 9, 2019.  Doc. 2; Doc. 41-45; Doc. 44 at 66.  Catz alleges the following claims against each of the defendants:  (1) fraudulent inducement; (2) unfair and deceptive trade practices; (3) breach of contract; (4) gender discrimination in violation of Title VII; (5) racial discrimination in violation of Title VII and 42 U.S.C. § 1981; (6) retaliation and wrongful termination in violation of Title VII and 42 U.S.C. § 1981; and (7) violations of the EPA and FLSA.  Doc. 2 at 8.

On August 29, 2019, the Court referred the case to its Mediation Program for mediation. Doc. 8.  Catz was represented by *pro bono* counsel for the limited purpose of these negotiations.

---

[5] Phaidon contends that D2 removed Catz from the position on June 18, 2018, not June 15, 2018.  Doc. 28 at 6.

Doc. 26.  On July 20, 2020, the parties advised the Court that they had reached a settlement in principle, which prompted the Court to discontinue the action.  Doc. 48.

Meanwhile, PGC, D2, and Phaidon each filed motions to compel arbitration on January 31, 2020, before the settlement in principle was reached.  Doc. 27; Doc. 30; Doc. 33.  Catz filed an opposition to the defendants' motions on May 28, 2020, then resubmitted her memorandum on June 26, 2020.  Doc. 40; Doc. 44.  Further briefing on these motions was discontinued in light of the anticipated settlement.  However, Catz asked the Court to reopen the action on November 16, 2020, as settlement negotiations had fallen apart.  Doc. 55; Doc. 56.  The Court granted Catz's request on November 23, 2020.  Doc. 57.  On January 8, 2021, Phaidon, D2, and PGC each filed replies to Catz's opposition to their motions.  Doc. 58; Doc. 59; Doc. 60.

## II.    Legal Standard

Under the FAA, "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable."  9 U.S.C. § 2.  The FAA reflects "a liberal federal policy favoring arbitration agreements," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)), and places arbitration agreements on "the same footing as other contracts."  *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974)).  Thus, parties are not required to arbitrate unless they have agreed to do so.  *Id.*  Before an agreement to arbitrate can be enforced, the district court must first determine whether such agreement exists between the parties.  *Id.*  This question is determined by state contract law principles.  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (citing *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 27 (2d Cir. 2002)).

In the context of motions to compel arbitration, allegations related to the question of whether the parties formed a valid arbitration agreement are evaluated to determine whether they raise a genuine issue of material fact. *Schnabel*, 697 F.3d at 113; *see also Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) ("In the context of motions to compel arbitration brought under the [FAA], the court applies a standard similar to that applicable for a motion for summary judgment. If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary.") On a motion for summary judgment, the court considers "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits," and draws "all reasonable inferences in favor of the non-moving party." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (internal quotation marks and citations omitted).

If the Court determines that a valid agreement to arbitrate exists, the Court must then determine whether the particular dispute falls within the scope of arbitration agreement. *Specht*, 306 F.3d at 26 (2d Cir. 2002) (citing *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987)). If the dispute falls within the scope of the arbitration clause, the "role of the court ends and the matter is one for arbitration." *Unique Woodworking, Inc. v. N.Y. City Dist. Council of Carpenters' Pension Fund*, No. 07 Civ. 1951 (WCC), 2007 WL 4267632, at *4 (S.D.N.Y. Nov. 30, 2007).

In the case of a *pro se* plaintiff, the Court will construe the complaint liberally, *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011), and will interpret the claims as raising the strongest arguments that they suggest. *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (citing *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010)). However, this does not "relieve

plaintiff of his duty to meet the requirements necessary to defeat a motion for summary

judgment." *Jorgensen v. Epic/Sony Recs.*, 351 F.3d 46, 50 (2d Cir. 2003).

## III.   Discussion

### a.   Catz's Opposition Brief

In their reply briefs, both Phaidon and PGC argue that the Court should strike Catz's

sixty-six-page opposition brief because it exceeds the Court's twenty-five-page limit for

memoranda of law in opposition to a motion.  Doc. 58 at 6; Doc. 60 at 6 n.1.  While it is within

the Court's discretion to strike memoranda for failing to abide by the Court's Individual

Practices, courts throughout the Second Circuit have typically exercised such discretion only

when the opposing party is prejudiced by the violation or did not have the opportunity to respond

in its own memorandum.  *See, e.g.*, *Nat'l Grid Corp. v. Brand Energy Servs.*, No. 13 Civ. (DRH)

(ARL), 2017 WL 1194499, at *10 n.7 (E.D.N.Y. Mar. 30, 2017) (denying defendant's request to

strike excess pages from plaintiff's memorandum because it did not prejudice defendant); *Guity

v. Uniondale Union Free Sch. Dist.*, No. 15 Civ. 5693 (SJF) (AKT), 2017 WL 1233846, at *2

(E.D.N.Y. Mar. 31, 2017) (adopting magistrate judge's recommendation not to strike

memorandum that exceeded court's page limit because defendants had "full and fair opportunity

to respond to it accordingly in their reply papers").  Courts are particularly wary of exercising

such discretion where the party filing the faulty brief is proceeding *pro se*.  *See, e.g.*, *Perez v.

U.S. Immigr. & Customs Enf't*, No. 19 Civ. 3154 (PGG), 2020 WL 5362356, at *3–4 (S.D.N.Y.

Sept. 8, 2020) (waiving page limit requirement for *pro se* plaintiff whose brief exceeded court's

page limit); *Bank v. Spark Energy, LLC*, No. 19 Civ. 4478 (PKC) (LB), 2020 WL 6873436, at *6

(E.D.N.Y. Nov. 23, 2020) ("[T]he Court finds it unnecessary in this case to strike any portion of

[*pro se*] Plaintiff's reply, as . . . Defendant has not suffered any prejudice from the unauthorized and overly long reply.").

Here, the defendants have suffered no prejudice as a result of Catz's lengthy opposition memorandum. Each defendant has had a "full and fair opportunity" to consider Catz's memorandum and to respond to it in their reply papers. *See Guity*, 2017 WL 1233846, at *2. Especially in light of the fact that Catz is proceeding *pro se*, this Court will exercise its "broad discretion" to overlook Catz's failure to comply with the Court's Individual Practices. *See Brown Publ'g Co. v. Brown*, No. 15-MC-0531 (JS), 2017 WL 455418, at *4 (E.D.N.Y. Feb. 1, 2017) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001)).

**b. Catz's Title VII Claims**

Next, each defendant argues that this Court should dismiss Catz's Title VII claims, as Catz's complaint was docketed on August 9, 2019—one day after the agreed-upon August 8, 2019 deadline for Catz to file her complaint. Doc. 28 at 7 n.1; Doc. 31 at 19–20; Doc. 34 at 15–17. Although her complaint was not docketed until August 9, 2019, Catz argues in her opposition brief that the complaint was timely received by the Pro Se Office on August 8, 2019. Doc. 44 at 66. As an exhibit to that brief, Catz has provided a "proof-of-delivery" from FedEx, which indicates that an item was shipped "overnight" on August 7, 2019 and was received in New York at 10:22[6] on August 8, 2019. Doc. 41-45.

The defendants correctly note that courts throughout the Second Circuit strictly apply the ninety-day deadline to file suit after receipt of a Notice of Right to Sue from the EEOC, even in the case of a *pro se* plaintiff. *See, e.g.*, *Perez v. Mason Tenders Dist. Council Tr. Funds*, No. 17 Civ. 1022 (PAE) (AJP), 2017 WL 5125542, at *3 (S.D.N.Y. Nov. 1, 2017) (collecting cases in

---

[6] The proof-of-delivery does not indicate whether the package was received at 10:22 AM or 10:22 PM.

which courts dismissed complaints because plaintiffs filed after deadline).  However, the Court

finds that Catz has complied with the agreed-upon deadline, since her complaint was received on

August 8, 2019.  Although her complaint was not docketed until one day after the deadline, Catz

has put forth sufficient evidence in the form of the FedEx proof-of-delivery to show that the

Court timely received her complaint on August 8, 2018.  *See Friedman v. Swiss Re Am. Holding

Corp.*, 512 F. App'x 94, 96–97 (2d Cir. 2013) (citing *Toliver v. Cnty. of Sullivan*, 841 F.2d 41,

42 (2d Cir. 1988)) (deeming *pro se* plaintiff's complaint timely filed when submission was

received before expiration of limitations period, but not filed until after that date).  Thus, this

Court will not dismiss Catz's Title VII claims on the basis of the timeliness of her complaint.

### c.  PGC's Motion to Compel Arbitration

#### 1.  Valid Agreement to Arbitrate

The Court next analyzes whether there is a valid agreement between Catz and PGC to

submit the dispute to arbitration.  Catz does not dispute that she signed PGC's Employment

Agreement, which contains an arbitration provision.  However, Catz argues that the arbitration

agreement is invalid because it was obtained under unconscionable and coercive circumstances.

Doc. 44 at 57–58.

#### A.  Unconscionability

The Court may render unenforceable a contract that was unconscionable at the time the

parties entered into it.  *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 828 (N.Y.

1988).  "A determination of unconscionability generally requires a showing that the contract was

both procedurally and substantively unconscionable when made—i.e., 'some showing of an

absence of meaningful choice on the part of one of the parties together with contract terms which

are unreasonably favorable to the other party.'"  *Id.* (quoting *State v. Avco Fin. Serv. of N.Y. Inc.*,

406 N.E.2d 1075, 1078 (N.Y. 1980)).  Procedural and substantive unconscionability operate on a "'sliding scale'; the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa."  *State v. Wolowitz*, 96 A.D.2d 47, 68 (N.Y. App. Div. 1983).

The undisputed facts do not indicate a substantively unconscionable contract, nor does Catz allege substantive unconscionability.  Under New York law, an arbitration provision that equally binds both parties to arbitration—as does the arbitration provision here—is not substantively unconscionable.  *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 573 (S.D.N.Y. 2009); *see also JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 170 n.5 (2d Cir. 2004); *Desiderio v. Nat'l Ass'n of Secs. Dealers, Inc.*, 191 F.3d 198, 207 (2d Cir. 1999).

Given the lack of substantive unconscionability, the undisputed facts must describe an overwhelmingly procedurally unconscionable contract in order for the Court to render it unenforceable.  *See Wolowitz*, 96 A.D.2d at 68.  In determining the procedural unconscionability of the Employment Agreement under New York law, the Court "consider[s] whether the party seeking enforcement 'used deception or high pressure tactics' in the formation of the agreement or there was a disparity in bargaining power between the parties."  *Chatziplis v. PriceWaterhouseCoopers LLP*, No. 17 Civ. 4109 (ER), 2018 WL 3323820, at *4 (S.D.N.Y. July 6, 2018) (quoting *Isaacs v. OCE Bus. Servs.*, 968 F. Supp. 2d 564, 570 (S.D.N.Y. 2013)).

The undisputed facts do not indicate the use of deceptive tactics.  First, the Employment Agreement and the W2 Schedule, taken together, clearly define PGC as Catz's employer.  They further define Phaidon and D2 as PGC's client and end client, respectively.  The Employment Agreement explicitly states that Catz's employment with PGC is at-will.  The arbitration provision clearly lays out the dispute resolution procedure.  The onboarding email that Catz

received from PGC on April 5, 2018 states that PGC "will be [Catz's] employer of record for the duration of this project."  Doc. 32-4.  Thus, PGC made clear its role as Catz's employer and the terms of their employment relationship.

The undisputed facts similarly fail to show the use of high-pressure tactics.  Rather than being threatened with termination for failure to agree to the arbitration provision, as Catz alleges, PGC merely required that she agree to this term as a condition of employment.  PGC provided Catz with instructions to access the contract before she relocated to Raleigh.  Doc. 32-4.  It asked that she complete the onboarding process before coming onsite.  *Id.*  Catz failed to do so.  Instead, Catz chose to relocate to Raleigh and begin working without having reviewed and signed the Employment Agreement.  Doc. 41-20.  In reliance on New York law, courts have held that it is not procedurally unconscionable for an employer to offer contract terms, like an arbitration provision, on a "take it or leave it" basis.  *See, e.g.*, *Ragone v. Atl. Video at Manhattan Ctr.*, No. 07 Civ. 6084 (JGK), 2008 WL 4058480, at *7 (S.D.N.Y. Aug. 29, 2008) (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (1991)) (holding that unequal bargaining power alone does not indicate procedural unconscionability), *aff'd*, 595 F.3d 115 (2d Cir. 2010); *Sablosky v. Edward S. Gordon Co.*, 535 N.E.2d 643, 647 (N.Y. 1989).  Here, PGC offered Catz specific contract terms on a "take it or leave it" basis, which included an arbitration provision, before she relocated to Raleigh and before she began working.  That Catz chose not to review the terms of the Employment Agreement until after relocating does not mean PGC utilized any high-pressure tactics in hiring her.

Catz argues that she would not have entered into the Employment Agreement had she known that PGC would be her employer, that she would be an at-will employee, and that she would be obligated to arbitrate her disputes.  These terms, however, were made clear in the

Employment Agreement.  To the extent that Catz failed to review or understand the contents of the contract, this does not excuse her from being bound by its terms.  *See Johnson v. Thruway Speedways, Inc.*, 63 A.D.2d 204 (N.Y. App. Div. 1978).  "In the absence of fraud or other wrongful act on the part of another contracting party, a party who signs or accepts a written contract . . . is conclusively presumed to know its contents and to assent to them."  *Kutluca v. PQ N.Y. Inc.*, 266 F. Supp. 3d 691, 701 (S.D.N.Y. 2017) (quoting *Fleming v. J. Crew*, No. 16 Civ. 2663 (GHW), 2016 WL 6208570, at \*3 (S.D.N.Y. Oct. 21, 2016)).

### B.  Coercion

To establish coercion under New York law, a plaintiff must show:  (1) a threat, (2) which was unlawfully made, and (3) which caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative.  *Berger v. Cantor Fitzgerald Secs.*, 967 F. Supp. 91, 94 (S.D.N.Y. 1997) (citing *Kamerman v. Steinberg*, 891 F.2d 424, 431 (2d Cir. 1989)).  Catz argues that the arbitration provision was obtained through coercion, since she had already been working for PGC from Raleigh when she signed the Employment Agreement.  According to Catz, she was forced to sign the Employment Agreement under threat of termination.

The Court rejects this argument.  First, as a matter of undisputed fact, Catz received instructions to access the Employment Agreement at least a week before relocating to Raleigh, but chose to begin working for PGC before signing the Employment Agreement.  Conditioning continued at-will employment on the employee agreeing to arbitrate future disputes does not constitute coercion by itself.  *See Griffith Laboratories U.S.A., Inc. v. Pomper*, 577 F. Supp. 903, 906 (S.D.N.Y. 1984).  *Compare Gruber v. Louis Hornick & Co.*, No. 02 Civ. 5092 (SHS), 2003 WL 21222541, at \*2 (S.D.N.Y. May 23, 2003) (finding no coercion where plaintiff's sole

allegation was that defendant told her that if she did not sign the agreement, she could no longer work for defendant), *with Brennan v. Bally Total Fitness*, 198 F. Supp. 2d 377, 383 (S.D.N.Y. 2002) (finding coercion where employer forced employee to sign substantively unconscionable sixteen-page document during fifteen-minute meeting or face termination).  Catz was free to refuse to sign the Employment Agreement, and thus to refuse to relocate to Raleigh and work for PGC.[7]  Having chosen to relocate to Raleigh before signing the Employment Agreement, Catz found herself in a predicament, undoubtedly.  But it was not one created out of any coercion by the defendants.

### 2.   The Dispute Falls Within the Scope of the Arbitration Provision

Since the Court has determined that a valid arbitration agreement exists, it next analyzes whether the dispute raised by Catz falls within the scope of the arbitration provision of the Employment Agreement.  *See Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 26 (2d Cir. 2002).  The first step in the Court's analysis is to classify the arbitration provision at issue as either broad or narrow.  *See Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001).  The arbitration provision here is "the paradigm of a broad clause," as it explicitly covers "[a]ny controversy, dispute, or claim arising out of or relating to this Agreement, the employment relationship, or any breach thereof."  Doc. 29-1 at 8–9; *Blystad Shipping*, 252 F.3d at 224; *see also Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995) ("The clause in this case, submitting to arbitration 'any claim or controversy arising out of or relating to the agreement,' is the paradigm of a broad clause.").  The

---

[7] Catz contends that she would not have signed the Confirmation of Contract with Phaidon on April 2, 2018 or the Agreement in relation to Provision of Services with D2 on April 18, 2018, had she known that she would ultimately be forced to arbitrate any disputes.  Doc. 44 at 58–59 n.26.  Even so, neither the Confirmation of Contract nor the Agreement in relation to Provision of Services constitute independent employment agreements.  Even having signed those two agreements, Catz could nevertheless have declined to sign PGC's operative Employment Agreement containing the arbitration provision, which she received on April 5, 2018.

Employment Agreement, in conjunction with the W2 Schedule, govern Catz's employment with PGC and the provision of her services to PGC's client—Phaidon—and PGC's end client—D2. Doc. 29-1 at 2.

When a contract contains a broad arbitration provision, there is a presumption of arbitrability. *Blystad Shipping*, 252 F.3d at 224. The Court will compel arbitration of even a dispute that does not implicate the contract's express provisions as long as "the claim alleged 'implicates issues of contract construction or the parties' rights and obligations under it.'" *Id.* (quoting *Collins & Aikman*, 58 F.3d at 23). "In determining whether a particular claim falls within the scope of the parties' arbitration agreement, courts focus on the factual allegations in the complaint rather than the legal causes of action asserted." *Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*, 633 F. Supp. 2d 109, 116 (S.D.N.Y. 2009) (quoting *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir. 1987)). Taking Catz's various factual allegations and legal claims in turn, the broad arbitration provision in the Employment Agreement covers the entirety of this dispute.

### A. Fraudulent Inducement

Catz asserts a claim of fraudulent inducement against the defendants, alleging that they "implement[ed] a fraudulent recruiting scheme" to deceive prospective employees into employment with PGC by making it appear instead that Phaidon or D2 would be the sole employer. Doc. 2 at 9. The Second Circuit has held that a claim of fraudulent inducement is subject to arbitration "when it challenges generally the enforceability of a contract containing an arbitration clause rather than specifically the arbitration clause itself." *ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 29 (2d Cir. 2002). Thus, while a court may adjudicate the issue where the plaintiff alleges fraudulent inducement in obtaining the *arbitration*

*provision specifically*, this principle does not extend to more general claims of fraud.  *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967) ("[I]f the claim is fraud in the inducement of the arbitration clause itself . . . the federal court may proceed to adjudicate it.  But the statutory language [of the FAA] does not permit the federal court to consider claims of fraud in the inducement of the contract generally.") *accord Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 449 (2006).

Catz specifically alleges in her complaint that the defendants' fraud induced her into accepting employment with PGC.  Doc. 2 at 9–10.  Catz does not allege that the defendants induced her into accepting the Employment Agreement's arbitration provision in particular. Since Catz's allegations of fraudulent inducement go to the enforceability of the contract as a whole and not to the enforceability of the arbitration clause in particular, her fraudulent inducement claim falls within the scope of the Employment Agreement's arbitration clause.

### B.  Unfair and Deceptive Trade Practices and Breach of Contract

Catz's claims of unfair and deceptive trade practices and breach of contract involve allegations that the defendants made and broke various promises about the terms and conditions of her employment.  Catz alleges in her complaint that the defendants "breached agreed-to terms and unilaterally imposed additional unconscionable conditions" upon her.  Doc. 2 at 15. According to Catz, the defendants reneged on the promise to provide her a senior managerial role, instead relegating her to the role of document reviewer.  *Id.* at 17.  They reneged on the promise to pay her a per diem of ninety dollars per day, seven days per week, instead telling her they would only pay her a per diem five days per week, before failing to pay her any per diem at all.  *Id.* at 15–17.  They failed to provide her with the promised cash advance to cover travel expenses and initial hotel expenses in Raleigh.  *Id.* at 15.  She alleges that the defendants failed

to reimburse her for work-related expenses and that they failed to give her access to the promised databases, training, and support to acquaint her with the job. *Id.* at 17. And she alleges that they forced her to relocate to Raleigh three weeks earlier than they had promised would be acceptable. *Id.* at 15.

Catz's factual allegations directly implicate the parties' rights and obligations under the Employment Agreement. *See Blystad Shipping*, 252 F.3d at 224 (finding a presumption of arbitrability where the claim goes to the parties' rights and obligations under the contract). Whether the defendants fulfilled their promises to adequately train Catz or to reimburse work-related expenses falls well within the bounds of claims related to Catz's employment relationship, and thus squarely within the scope of the arbitration provision. *See Camilo v. Lyft, Inc.*, 384 F. Supp. 3d 435, 440 (S.D.N.Y. 2019) (finding breach of contract claim within scope of broad arbitration provision); *Gateson v. ASLK-Bank, N.V.*, No. 94 Civ. 5849 (RPP), 1995 WL 387720, at *3–4 (S.D.N.Y. June 29, 1995) (same).

### C. Gender and Racial Discrimination, Retaliation, and Wrongful Termination

Catz alleges that the defendants "facilitated and enabled" discriminatory behavior on the basis of her gender and race. Doc. 2 at 18. Specifically, Catz alleges that white male employees received more favorable compensation than she did, despite performing the same, if not less, work. *Id.* She also alleges that white male employees received more favorable training opportunities and that one such employee in particular was given "supervisory power and authority over female and African American document reviewers who were more qualified, more experienced and more proficient at their work." *Id.* at 19. According to Catz, the defendants retaliated against her because she raised concerns about the work environment by relegating her to the role of document reviewer. *Id.* at 21. Finally, Catz alleges that less than a day after

reiterating these complaints, she received a text message from Phaidon informing her that D2 terminated her contract. *Id.* at 21–22. According to Catz, the defendants provided no explanation as to why they terminated her employment two months into her year-long employment contract. *Id.*

"It is well-established that Title VII claims are arbitrable." *Josie-Delerme v. Am. Gen. Fin. Corp.*, No. 08 Civ. 3166 (NG), 2009 WL 2366591, at *4 (E.D.N.Y. July 31, 2009) (quoting *EEOC v. Rappaport, Hertz, Cherson & Rosenthal, P.C.*, 448 F. Supp. 2d 458, 462 (E.D.N.Y. 2006)). In fact, the Second Circuit allows employers to mandate arbitration of its employees' Title VII claims. *See, e.g.*, *Virk v. Maple-Gate Anesthesiologists, P.C.*, 657 F. App'x 19, 22–23 (2d Cir. 2016); *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 150 (2d Cir. 2004); *Desiderio v. Nat'l Ass'n of Secs. Dealers, Inc.*, 191 F.3d 198, 206 (2d Cir. 1999). Thus, Catz's Title VII claims are arbitrable and fall within the scope of the Employment Agreement and its broad arbitration provision. *See Chatziplis v. PriceWaterhouseCoopers LLP*, No. 17 Civ. 4109 (ER), 2018 WL 3323820, at *5 (S.D.N.Y. July 6, 2018) ("Even if Chatziplis can make allegations that would support a Title VII claim, and those allegations are not time-barred, there is no reason why Chatziplis cannot raise these issues in arbitration."); *Cicchetti v. Davis Selected Advisors*, No. 02 Civ. 10150 (RMB), 2003 WL 22723015, at *2 (S.D.N.Y. Nov. 17, 2003).

### D. FLSA Violations

Catz alleges that the defendants violated the FLSA by failing to pay their employees overtime wages even though they knew or should have known that employees, including Catz, routinely worked more than forty hours per week. Doc. 2 at 22. According to Catz, the defendants implemented policies and procedures to prevent employees from accurately recording their overtime hours worked. *Id.*

Courts in this District have held that FLSA claims are arbitrable. *Arrigo v. Blue Fish Commodities, Inc.*, 704 F. Supp. 2d 299, 304 (S.D.N.Y. 2010), *aff'd*, 408 F. App'x 480 (2d Cir. 2011) ("The Court therefore concludes that Congress did not intend FLSA claims to be non-arbitrable.").  Where the dispute is related to whether the employee is owed overtime wages under the FLSA and where the arbitration provision at issue broadly encompasses any dispute involving the employment relationship, the dispute falls within the scope of that arbitration provision.  *See Bynum v. Maplebear Inc.*, 160 F. Supp. 3d 527, 541 (E.D.N.Y. Feb. 12, 2016) (finding that FLSA claims fall within scope of arbitration clause where arbitration clause includes broad language, stating that "the Parties agree that to the fullest extent permitted by law, any controversy, dispute, or claim arising out of or relating to the Services performed by the Contractors . . . shall be submitted to arbitration"); *Martin v. SCI Mgmt. L.P.*, 296 F. Supp. 2d 462, 467–68 (S.D.N.Y. 2003) (finding plaintiff's FLSA claim arbitrable where "the arbitration clause in the Agreement is a broad one, encompassing 'all disputes relating to any aspect of Employee's employment.'").  Here, Catz's FLSA claim falls within the scope of the Employment Agreement's broad arbitration provision.

### d.  Phaidon's and D2's Motions to Compel Arbitration

Having deemed arbitrable Catz's claims against PGC, the Court next analyzes the motions of Phaidon and D2 to compel arbitration.  As with PGC's motion, resolving these motions to compel arbitration first requires the Court to determine whether a valid agreement to arbitrate exists and, if so, to determine whether the dispute falls within the scope of the arbitration provision.  *See Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 26 (2d Cir. 2002) While there is a valid agreement to arbitrate between Catz and PGC and the dispute falls within the scope of the arbitration provision, neither Phaidon nor D2 is a signatory to the Employment

Agreement.  Doc. 29-1 at 9.  Thus, the Court must determine whether Phaidon and/or D2 can invoke the arbitration provision in the Employment Agreement to which they are not signatories.

The Supreme Court has explained that the FAA allows litigants already in federal court to invoke valid, irrevocable, and enforceable arbitration agreements, even when that litigant is not a party to the agreement, just as "traditional principles of state law allow a contract to be enforced by or against nonparties to the contract."  *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (internal quotations omitted).  In that same vein, the Supreme Court has recently reaffirmed that "arbitration agreements may be enforced by nonsignatories through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel.'"  *GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1643–44 (2020) (quoting *Carlisle*, 556 U.S. at 631).  Here, Phaidon and D2 argue that they may invoke the arbitration provision under a theory of equitable estoppel or as a third-party beneficiary.[8]  The Court will address these arguments in turn.

### 1.  Equitable Estoppel

The Second Circuit has repeatedly held that a signatory "is estopped from avoiding arbitration with a non-signatory 'when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'"  *See Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 404 (2d Cir. 2001) (quoting *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 98 (2d Cir. 1999)); *Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995).  To make this "intertwined-ness" determination, courts in this District apply a two-part test

---

[8] Phaidon argues that it may invoke the arbitration agreement pursuant to either one of these theories, while D2 only argues that it may do so through an equitable estoppel theory.  The Court finds that arbitration is merited under equitable estoppel, as described herein.  However, the Court will also address Phaidon's third-party beneficiary argument.

examining:  (1) whether the factual issues of the signatory's claims against the non-signatories

arise under the subject matter of the arbitration agreement, and (2) whether there was a close

relationship between "defendant signatory and defendant non-signatory."  *Chase Mortg.*

*Company-West v. Bankers Tr. Co.*, No. 00 Civ. 8150 (MBM), 2001 WL 547224, at *2–3

(S.D.N.Y. May 23, 2001) (outlining the two-part test).

### A.  Subject Matter

The intertwined-ness test's first prong asks the Court to consider whether Catz's claims

arise from the subject matter of the Employment Agreement with PGC.  This is a fact-specific

inquiry for which courts "have had no occasion to specify the minimum quantum of

'intertwined-ness' required to support a finding of estoppel."  *JLM Indust., Inc. v. Stolt-Nielsen*

*SA*, 387 F.3d 163, 178 (2d Cir. 2004) (citing *Smith/Enron*, 198 F.3d at 97); *Astra Oil Co. v.*

*Rover Navigation, Ltd.*, 344 F.3d 276, 279 (2d Cir. 2003).  Catz entered into the Employment

Agreement to govern her employment with PGC and her work for PGC's client (Phaidon) and

PGC's end client (D2).  Catz's array of claims stem from the formation, execution, and existence

of that very Employment Agreement.  Among her claims, Catz alleges that the defendants

collectively engaged in a fraudulent scheme to induce her into accepting employment with PGC,

that the defendants collectively broke promises they had made to her regarding the terms and

conditions of her employment, and that they wrongfully terminated her.  Doc. 2 at 15–17.  The

subject matter of Catz's Employment Agreement is, of course, her employment with PGC.  The

subject matter of Catz's claims involve the defendants' alleged transgressions related to her

employment with PGC.  The two are inextricably linked.  *See Ouedraogo v. A-1 Int'l Courier*

*Serv., Inc.*, No. 12 Civ. 5651 (AJN), 2014 WL 1172581, at *5 (S.D.N.Y. Mar. 21, 2014) (finding

subject matter of agreement and plaintiff's dispute sufficiently intertwined where plaintiff raised identical legal claims and factual allegations against each defendant).

### B. Relationship

The intertwined-ness test's second prong asks the Court to contemplate the closeness of the defendant signatory and defendant non-signatory, with an eye toward the role of the non-signatory defendants at the time of the alleged misconduct. *Chase Mortg. Company-West*, 2001 WL 547224, at *3. In doing so, "[c]ourts generally look to the pleadings to determine whether the underlying allegations infer a close relationship between a signatory and non-signatory movant." *Bankers Conseco Life Ins. Co. v. Feuer*, No. 16 Civ. 7646 (ER), 2018 WL 1353279, at *6 (S.D.N.Y. Mar. 15, 2018) (citing *Denney v. BDO Seidman, LLP*, 412 F.3d 58, 70 (2d Cir. 2005)) *abrogated on other grounds by Doe v. Trump Corp.*, 453 F. Supp. 3d 634 (S.D.N.Y. 2020). Estoppel is not necessarily appropriate, however, simply because "a relationship of any kind may be found among the parties to a dispute and their dispute deals with the subject matter of an arbitration contract made by one of them." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 359 (2d Cir. 2008). Instead, the Court must determine whether the arbitration agreement could reasonably be seen as extending to related entities to the contract, so as to make it unfair for a party to avoid arbitration with some entities merely because they were not signatories to the original contract. *See id.* at 361.

At the time of the alleged misconduct, the three defendants in this case maintained a business relationship whereby PGC employed individuals that Phaidon had recruited for jobs with D2. Doc. 2 at 9, 15; Doc. 28 at 5–6; Doc. 29, ¶¶ 3–7; Doc. 34 at 6; Doc. 35, ¶¶ 4, 7; Doc. 41-26. Well before Catz entered into the Employment Agreement, Phaidon communicated to Catz through email and by phone that it was recruiting candidates on behalf of D2. Doc. 41-16;

Doc. 41-17; Doc. 41-18.  This fact was reaffirmed by the Confirmation of Contract that Catz signed with Phaidon, which noted that her contract would be assigned to D2.  Doc. 41-5.  Catz also signed the Agreement in relation to Provision of Services with D2, which explained that Catz would be working for D2 as an "Independent Consultant" through "Precision Global Consulting, Inc. (the Consultant Company)."  Doc. 41-8.  And the Employment Agreement and W2 Schedules themselves defined Catz as a "PGC Employee," Phaidon as PGC's "Client," and D2 as PGC's "End Client."  Doc. 29-1 at 2; Doc. 29-2 at 2.  At the time Catz entered into the Employment Agreement, she could reasonably have seen that invocation of the arbitration provision would extend to Phaidon and D2 based on their close relationships to PGC, each concerning her employment.  *See Sokol*, 542 F.3d at 361.

Additionally, Catz asserts the same claims against each defendant.  Her allegations accuse the defendants of perpetrating a "collusive and fraudulent scheme" to induce Catz into employment with PGC.  Doc. 2 at 9.  Catz alleges that all three defendants broke the same promises to her about the terms and conditions of her employment with PGC.  She alleges that the defendants, collectively, engaged in gender and race discrimination.  Her pleadings refer to the defendants interchangeably and collectively.  Catz has "treat[ed] all defendants as a single unit in [her] complaint."  *See Victorio v. Sammy's Fishbox Realty Co.*, No. 14 Civ. 8678 (CM), 2015 WL 2152703, at *17 (S.D.N.Y. May 6, 2015).  Catz's treatment and understanding of all defendants as such closely related entities "further supports estopping [Catz] from shielding [her]self from arbitrating with certain defendants."  *See id*; *see also Ouedraogo*, 2014 WL 1172581, at *5 (finding intertwined-ness test satisfied where plaintiff alleged identical allegations against defendants and did not distinguish between defendants throughout pleadings).

Given the defendants' intertwined-ness, Catz's knowledge of it upon entering the arbitration agreement, and her acknowledgment of it in her pleadings, it would be unfair for Catz to avoid arbitration with Phaidon and D2 just because they were not signatories to her Employment Agreement with PGC.  *See Sokol*, 542 F.3d at 361.  Catz's promise to arbitrate extends not only to PGC, but also to Phaidon and D2, as it would prejudice Phaidon and D2 to prohibit them from seeking arbitration over the very same claims for which PGC can compel arbitration.  *See id.*

The Court notes that, although Catz's pleadings center on the allegedly collusive and often interchangeable nature of the defendants, she changes course in her opposition brief to argue that she should not be estopped from avoiding arbitration with Phaidon and D2 because they did not act in concert with PGC in such a manner to justify arbitration.  Doc. 44 at 47. However, Catz's pleadings evince the close relationship between the defendants, and she cannot now ignore the allegations in her pleadings.  *See Denney*,  412 F.3d at 70 ("Having alleged in this RICO action that [the defendants] acted in concert to defraud plaintiffs . . . plaintiffs cannot [on a motion to compel arbitration] now escape the consequences of those allegations by arguing that [the defendants] lack the requisite close relationship."); *Bankers Conseco Life*, 2018 WL 1353279, at *6 ("Courts generally look to the pleadings to determine whether the underlying allegations infer a close relationship between a signatory and non-signatory movant.") *abrogated on other grounds by Doe*, 453 F. Supp. 3d 634.  Catz's evolving argument and reframing of the facts in her opposition brief in an effort to distance the actions of each defendant from one another does not erase the closeness of the defendants that Catz intricately pleaded in her complaint.  Nor does it erase the fact that Catz has asserted identical claims against each defendant.  *See Ouedraogo*, 2014 WL 1172581, at *5 (finding sufficient intertwined-ness to

compel arbitration where plaintiff raised "identical legal claims and factual allegations" against signatories and non-signatories alike).

Moreover, the facts as reframed in Catz's opposition brief still fail to convince the Court that the defendants lack the requisite close relationship to compel arbitration. In her opposition brief, Catz alleges that each defendant "had different and distinct roles during [her] employ." Doc. 44 at 47. Catz distinguishes Phaidon's role as the recruiter from D2's role as her employer from PGC's role "solely as a third party hired to manage administrative matters." *Id.* at 47–49. Even accepting this version of facts as true, however, the respective roles allegedly played by the defendants remain closely tethered through the various agreements that govern Catz's employment, which forms the basis of her dispute with each defendant. *See Choctaw Generation Ltd. P'Ship v. Am. Home Assurance Co.*, 271 F.3d 403, 406–07 (2d Cir. 2001) (estopping plaintiff from avoiding arbitration with non-signatory "when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed"); *Ragone v. Atl. Video at Manhattan Ctr.*, No. 07 Civ. 6084 (JGK), 2008 WL 4058480, at *9 (S.D.N.Y. Aug. 29, 2008) (estopping plaintiff from avoiding arbitration where plaintiff was hired by signatory specifically to be assigned to non-signatory moving to compel arbitration). Even in light of Catz's revised set of facts, the issues that Phaidon and D2 seek to arbitrate are sufficiently intertwined with the Employment Agreement—and thus with PGC as an entity—for the Court to compel arbitration of Catz's claims against them. *See Choctaw*, 271 F.3d at 404. The arbitrator will consider the merits of Catz's claims against each defendant.

## 2.   Third-Party Beneficiary

Phaidon also argues that it can invoke the arbitration provision as a third-party beneficiary of the Employment Agreement.[9]  Doc. 28 at 10–11.  "Under New York law, to establish rights as a third-party beneficiary, a party must establish '(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for its benefit, and (3) that the benefit to it is sufficiently immediate . . . to indicate the assumption by the contracting parties of a duty to compensate it if the benefit is lost.'"  *Gerszberg v. Li & Fung (Trading) Ltd.*, 215 F. Supp. 3d 282, 291 (S.D.N.Y. 2016) (quoting *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011)).  "Although a 'party need not necessarily be specifically mentioned in a contract to be considered a third-party beneficiary,' the parties' intention to benefit the third party nonetheless must be revealed 'on the face of the agreement.'"  *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 163 (S.D.N.Y. 1998) (quoting *Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 663 (2d Cir. 1996)).

As previously discussed, there exists a valid and binding contract between Catz and PGC. Further, Phaidon has established that the Employment Agreement was intended for its benefit. In support, Phaidon references the first paragraph of the Employment Agreement, titled "Scope,"[10] and which, in conjunction with the W2 Schedule,[11] explains that Catz agreed to

---

[9] D2 has not asserted this argument.  However, the Court's analysis would apply to Phaidon and D2, alike.

[10] "Scope. Employee agrees by entering into this Agreement to provide Company's Client, or their End Client, (together "Client") with professional services for individual Client Assignments ("Assignment") as an employee of Company.  For each role, Employee will receive a detailed Schedule ("Schedule") that designates hourly rate, dates of role, location, additional benefits provided by Client and other details specific to the placement.  The Schedule will exist in conjunction with this Agreement and should any terms contradict, the Schedule will supersede."  Doc. 29-1 at 2.

[11] The W2 Schedule defines Phaidon as PGC's "Client" and D2 as PGC's "End Client."  It defines PGC as the "Company" and Catz as a "PGC Employee."  Doc. 29-2 at 2.

provide Phaidon and/or D2 with professional services as an employee of PGC.  Doc. 28 at 10–

11.  Although Phaidon and D2 are not signatories to the Employment Agreement, they clearly

benefit from it by obtaining Catz's services through the Agreement.  Additionally, the language

of the arbitration provision in particular is not limited to the Employment Agreement's

signatories.  Doc. 29-1 at 8.  Instead, it applies to "[a]ny controversy, dispute, or claim arising

out of or relating to this Agreement, the employment relationship, or any breach thereof."  *Id.*;

*see McCants v. Team Electric, Inc.*, No. 19 Civ. 9565 (AJN) (RWL), 2021 WL 653122, at *4

(S.D.N.Y. Feb. 19, 2021) (deeming defendant a third-party beneficiary where arbitration

provision applies to "any entity to whom the employee is dispatched for work and/or any

employee, agent, or representative of such entity"); *cf. Republic of Iraq v. ABB AG*, 769 F. Supp.

2d 605, 610 (S.D.N.Y. 2011) (finding plaintiff was not a third-party beneficiary where arbitration

agreement specifically states that disputes "shall be referred by *either Party* to arbitration").  In

fact, it explicitly mandates that the "disputing parties" agree to settle the dispute through

arbitration.  Doc. 29-1 at 8.  The decision not to limit this provision more specifically to the

Employment Agreement's signatories is further evidence of the parties' intent to provide

Phaidon and D2 with the benefit of invoking arbitration for disputes "relating to" the Agreement

or employment relationship.  And as the Court has already analyzed, all allegations in this case

fall within the scope of the arbitration agreement.

### e.  Catz's Remaining Arguments

Finally, Catz raises additional arguments that set forth why she should not be forced to

arbitrate her claims.  Catz argues that Phaidon and D2 have unclean hands and so they cannot

invoke the arbitration provision through equitable estoppel.  Doc. 44 at 53–55.  In asserting this

argument, Catz reiterates the factual allegations that form the basis of her claims.  For example,

Catz alleges that Phaidon and D2 induced her to accept employment and that they wrongfully terminated her. However, the doctrine of unclean hands only bars enforcement of an arbitration agreement under equitable estoppel "if the unclean hands relate to the arbitration agreement itself, not to the merits of the underlying dispute." *In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d 465, 480 (S.D.N.Y. 2013). The purpose of the arbitration agreement is to resolve such disputes as Catz has alleged in her pleadings. She cannot merely recite these same allegations to argue that the unclean hands doctrine should preclude the arbitration of these very claims. *See id.* at 483.

Catz also argues that the Court cannot compel arbitration of her disputes because the defendants did not attempt to mediate in good faith, as required by the arbitration provision, before seeking arbitration. Doc. 44 at 56. However, Catz's only support for this argument is that she deemed the defendants' mediation statement "inadequate" and that they seemed "wholly unprepared or unwilling to negotiate in good faith." *Id.* Catz's conclusory allegations are insufficient to preclude arbitration. The available record shows that the parties hired a professional mediator to aid negotiations. *See id.* Catz has alleged no facts indicating a lack of good faith on the part of the defendants.

Additionally, Catz argues that public policy implications should prevent the Court from compelling arbitration in this case. *Id.* at 63. Catz has proffered policy critiques of the defendants' reliance on temporary staffing, and the impact of such practices on women and minorities. *Id.* at 64–65. However, since 1983, and as recently as 2019, the Supreme Court has reiterated that the FAA declares "a liberal federal policy favoring arbitration agreements." *See, e.g.*, *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 543 (2019); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). In fact, the Supreme Court has explained that the

FAA requires courts to enforce arbitration agreements according to their terms "unless the FAA's mandate has been 'overridden by a contrary congressional command.'" *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (quoting *Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 226 (1987)).  While Catz may well identify valid social concerns, she does not argue that any such contrary congressional command exists based on these concerns that would overrule the FAA's well-established mandate, nor is the Court aware of any such congressional command.  Thus, public policy does not prevent the Court from enforcing the arbitration clause.

Finally, Catz asks the Court for permission to amend her complaint "to reframe her legal strategy and elaborate clarify [sic] her statement of facts."  Doc. 44 at 66.  Although Fed. R. Civ. P. 15(a)(2) compels courts to "freely give leave when justice so requires," it is well within the Court's discretion to deny leave to amend "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend.").

Catz has not provided any more detail into how she would amend her complaint if given the opportunity.  However, Catz has already attempted to reframe the facts to distinguish the actions of each defendant in her opposition brief, and the Court still found that the defendants were sufficiently intertwined such that Phaidon and D2 could invoke the arbitration provision.  Efforts to amend her complaint to alter the statement of facts in a similar fashion would be similarly futile.  *See, e.g.*, *Convergen Energy LLC v. Brooks*, No. 20 Civ. 3746 (LJL), 2020 WL 5549039, at *27 (S.D.N.Y. Sept. 16, 2020) ("The new allegations Plaintiffs would bring . . . do

not change that result.  In light of that conclusion, and the Court's decision to compel arbitration, the motion for leave to amend the Complaint is denied as futile."); *Kutluca v. PQ N.Y. Inc.*, 266 F. Supp. 3d 691, 704–05 (S.D.N.Y. 2017) (denying motion to amend as futile because claims asserted in amended complaint would also be subject to arbitration); *Oguejiofo v. Open Text Corp.*, No. 09 Civ. 1278 (RWS), 2010 WL 1904022, at *3 (S.D.N.Y. May 10, 2010) ("Since the arbitration clause applies to this dispute, the court lacks subject matter jurisdiction over Pima's claim and any amendment by Pima would be futile.").

### f.   The Court Will Stay Proceedings Pending Arbitration

The defendants have asked the Court to resolve their motions in different ways.  Phaidon asks the Court to dismiss Catz's complaint in its entirety.  Doc. 28 at 14.  PGC asks the Court to stay the case pending arbitration or, in the alternative, dismiss Catz's Title VII claims as untimely.  Doc. 31 at 19–20.  D2 asks the Court to stay the case pending arbitration *and* dismiss Catz's Title VII claims as untimely.  Doc. 34 at 15–17.[12]

The Court will refer the entirety of this dispute to arbitration.  When the Court refers an issue to arbitration, it "shall on application of one of the parties stay the trial of the action until such arbitration has been had."  9 U.S.C. § 3; *see also Abel v. All Green Bldg. Servs. of N.Y. LLC*, No. 16 Civ. 8522 (JPO), 2017 WL 5468764, at *2 (S.D.N.Y. Nov. 14, 2017) ("Accordingly, the Court concludes that Abel is indeed required to arbitrate, but that outright dismissal is not warranted.  Instead, the case will be stayed to allow the parties to arbitrate Abel's claims.").  Although the Supreme Court has not yet addressed the issue, the Second Circuit has held that "a stay of proceedings [is] necessary after all claims have been referred to arbitration and a stay requested."  *Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015); *see also Lebovits*

---

[12] The Court will not dismiss Catz's Title VII claims as untimely.  *See supra* Section III.b.

*v. Cavalry Portfolio Servs., LLC.*, No. 20 Civ. 01116 (KMK), 2021 WL 1198967, at *8 (S.D.N.Y. Mar. 29, 2021) (granting motion to compel arbitration, staying the case pending arbitration, and denying motion to dismiss).

Since all of the claims in this action have been referred to arbitration and since a stay has been requested, these proceedings are stayed pending arbitration pursuant to 9 U.S.C. § 3.  *See Katz*, 794 F.3d at 346–47.

## IV.    Conclusion

For the reasons set forth above, the defendants' motions to compel arbitration are GRANTED, and this action is STAYED pending arbitration.  To the extent that the defendants seek dismissal of this action, their motions are DENIED.  The parties are instructed to advise the Court within forty-eight hours of the outcome of the arbitration.  The Clerk of the Court is respectfully directed to stay this action pending arbitration and to terminate the motions, Docs. 27, 30, 33.

It is SO ORDERED.

Dated:    April 23, 2021
          New York, New York

_____
          Edgardo Ramos, U.S.D.J.